**In re Sonya W. BUTCHER, Debtor.**

**Bankruptcy No. 3-83-01422.**

United States Bankruptcy Court,
E.D. Tennessee.

May 2, 1986.

McMackin, Garfinkle & McLemore, Edwin M. Walker, Nashville, Tenn., for trustee.

Troutman, Sanders, Lockerman & Ashmore, Ezra H. Cohen, Mary Grace Diehl, Atlanta, Ga., and Daniel, Claiborne, Oberman & Buuck, David Buuck, Knoxville, Tenn., for debtor.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether the debtor is entitled to a homestead exemption under Florida law. Also at issue is whether the debtor is entitled under Florida law to exempt the cash surrender value of certain life insurance policies of which she is the owner and beneficiary.

On September 9, 1983, an involuntary chapter 7 petition was filed against the debtor Sonya W. Butcher. Initially, the debtor contested the entry of an order for relief. Some six months later, however, she consented to the entry of an order for relief on March 28, 1984. Shortly thereafter, on April 10, 1984, the debtor converted her case to a chapter 11 case. The debtor's subsequent efforts to obtain confirmation of a plan were unsuccessful. On August 15, 1985, upon motion of the Federal Deposit Insurance Corporation, the debtor's case was converted back to a chapter 7 case.

In her Schedule B–4, the debtor claimed the following property as exempt:[1]

---

1. The trustee has not contested the debtor's right to assert her exemption rights under Florida rather than Tennessee law. See 11 U.S.C.A. § 522(b)(2)(A) (West 1979).

| Location, Description & so far as relevant to the claim of exemption, present use of property | Specify statute creating exemption | Value Claimed Exempt |
| --- | --- | --- |
| Cash Surrender Value of Life Insurance Policies Listed in Schedule B-2(r)[2] | Fla. Statutes § 222.14 | Full value est[imated] to be in excess of $55,000 |
| Legal Residence at 100 Magnolia Lake Court, Longwood, Florida; being Lot 9 Block C Sweetwater Club Unit 2 in plat book 21, pp. 77-79 in public records Seminole County, Florida | Fla. Constitution Article X, § 4 | Full value of Debtor's interest approx value in excess of $337,500.00 |
| Gold Ring with Diamond inset up to the value $1000.00 | Fla. Statutes § 222 | Full value not to [exceed] $1000 statutory limitation |

The trustee has objected to the debtor's claim of exemptions.

## THE TRUSTEE'S OBJECTION TO THE DEBTOR'S CLAIM OF A FLORIDA HOMESTEAD EXEMPTION

When the debtor's chapter 7 case was initially commenced in September 1983, the Florida homestead exemption statute provided:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property *owned by the head of a family:*

(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or his family;

(2) personal property to the value of one thousand dollars.

Fla.Const. art. 10, § 4(a) (1970) (emphasis supplied).

However, by amendment approved in November 1984 the Florida homestead exemption statute was amended to substitute the phrase "natural person" for the phrase "the head of a family." *See* Fla.Const. art. 10 § 4(a) (West Supp.1986).

The debtor advances three separate arguments in support of her claim to a Florida homestead exemption:

(1) First, the debtor maintains that she is not required to establish her status as "the head of a family" in order to be entitled to the Florida homestead exemption. She contends that August 15, 1985 (the date of conversion of her case back to chapter 7) is the controlling date for determining the applicable law relative to her exemption rights. Thus, since the amended version of the statute (deleting the phrase "the head of a family" and substituting the phrase "natural person") was in effect on that date, the debtor asserts she is entitled to

2. The debtor amended her exemptions in December 1985 to claim as exempt Massachusetts Mutual life insurance policy number 5533830 which she owns and which insures the life of her husband. The parties have agreed that the approximate cash value of that policy is $174,-000.00.

claim the homestead exemption under the amended statute.

(2) Alternatively, the debtor argues that, even assuming the former homestead statute applies, the date of entry of the order for relief (March 28, 1984) is the date fixing the property which an involuntary debtor may exempt. Thus, the debtor asserts she is entitled to exempt the Florida home because she had attained the status of "the head of a family" by that date.

(3) Finally, the debtor insists that, even assuming the date of the filing of her involuntary petition determines the property which she may exempt, she had attained the status of "the head of a family" even on that date (September 9, 1983).

I

The court will consider first the debtor's contention that the date of conversion of her case from a chapter 11 case to a chapter 7 case determines the applicable law fixing her exemption rights.

Section 522(b)(2)(A) of the Bankruptcy Code provides insofar as is pertinent:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate ...

(2)(A) any property that is exempt under ... State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place....

11 U.S.C.A. § 522(b)(2)(A) (West 1979).

In support of her argument the debtor cites the holdings of *In re Stinson*, 27 B.R. 18 (Bankr.D.Or.1982) and *Armstrong v. Lindberg (In re Lindberg)*, 735 F.2d 1087 (8th Cir.1984). Both were cases involving the conversion of a chapter 13 case to a chapter 7 case. *Stinson* held that where a state had "opted out" of the federal exemptions between the filing of a chapter 13 case and its conversion to chapter 7, the law in effect at the time of conversion

governed what property could be claimed exempt in the converted case. *Lindberg* held that debtors who converted a chapter 13 to a chapter 7 case could claim a homestead exemption in different property (a farm) than the property (a house and lot) in which they had designated a homestead exemption at the commencement of the chapter 13 case.

However, in both cases the courts emphasized as a basis for the holdings the peculiarities and policies inherent in chapter 13 cases. *Lindberg*, for example, emphasized the "limited purpose" of exemptions in chapter 13, pointing out that confirmation vests the property of the estate in the debtor, who remains in possession of his property. 735 F.2d at 1089. The court emphasized that in a case converted from chapter 13 to chapter 7, property liquidated in the chapter 7 case would include new property acquired after the filing of the chapter 13 petition. The court also pointed to the "purely voluntary" nature of the chapter 13 case which would permit a chapter 13 debtor to dismiss the chapter 13 at any time and simply refile a chapter 7. 735 F.2d at 1090–91.

■■ This court need not either accept or reject the holdings of these cases. Nor need this court decide whether the reasoning of these decisions translates to the context of a chapter 11 case in which conversion to chapter 7 has occurred after the confirmation of a plan. Even were the court to so assume (*arguendo* and without so deciding), none of the above-enumerated policies or considerations are implicated here where no chapter 11 plan was ever confirmed. Here, no confirmation re-vested any property of the estate in the debtor. Most significantly, no plan was confirmed which in any way augmented the estate with any post-petition property or earnings. This case was not a voluntary case which the debtor could simply have dismissed in order to avail herself of new and more favorable exemption laws. This court can find no reason to extend the holdings of *Stinson* and *Lindberg* to these facts nor any policy basis to read § 522(b)(2)(A) other

than as it is written. The debtor's exemptions will be determined under the "State or local law that is applicable on the date of the filing of the petition." 11 U.S.C.A. § 522(b)(2)(A) (West 1979).

## II

In support of her alternative contention that the date of entry of the order for relief is the date fixing the property which she may exempt, the debtor relies upon the decision reached by the district court in *Wilson v. Davis (In re Wilson)*, 62 B.R. 43 (E.D.Tenn.1985). There the district court held that "the correct date for determining which property of the debtor will be subject to exemptions in an involuntary bankruptcy case is the date on which the order for relief is filed." *Wilson*, at 5. However, this court finds under these facts that it is unnecessary to reach the issue of whether the date of the entry of the order for relief or the date of the filing of the petition determine which property of the debtor may be exempted under the applicable exemption law. Here, that issue is immaterial because this court finds that the debtor was not "the head of a family" on either date.

The debtor and her husband Jake F. Butcher were married in 1962. Asked whether she worked outside the family between 1962 and 1974 (the year in which the debtor and her husband completed and moved into their Tennessee home known as Whirlwind), her husband testified only that she had assisted in decorating and furnishing some of the banks in which he was involved. From 1974 to 1982 the debtor was involved in numerous civic activities (e.g. the Knoxville Symphony and the Arts Commission). She also assisted her husband in his political activities during two gubernatorial campaigns. She did a "tremendous amount of entertaining." Deposition of Sonya Wilde Butcher, at 24 (November 27, 1985). She "knew little or nothing about [her husband's] Jake's business affairs." She "knew nothing about his investments." *Id.* at 26. She spent a lot of time raising their children. She did not

handle the family checkbook—a secretary kept the family accounts and wrote the checks after the debtor looked over the bills. After 1978, activities connected with her husband's involvement in the 1982 World's Fair in Knoxville occupied much of her time. The debtor testified that she had no earned income of her own from 1974 through September 1983 when the involuntary petition was filed. *Id.* at 57–58.

In February 1983 the FDIC closed the United American Bank, a primary business venture of the debtor's husband. The debtor decided to move to Florida about the last of February.. She apparently permitted her children to finish the school year in Tennessee. After March she began looking for a permanent home. She purchased the Florida home in question with funds provided by her husband from the cash surrender value of certain insurance policies. From February 1983 to September 1983 her primary source of income consisted of funds furnished by her husband from cash surrender value of insurance policies.

On December 8, 1983, she received a license in Florida to do real estate sales work in Florida. She "placed it" with Pat Wetnight, a real estate agent, on the same date. The debtor's monthly chapter 11 operating reports from April through December 1984 indicate that the debtor received only $3,348.80 in real estate commissions for that period. It should be borne in mind that even these minimal earnings were after the entry of the order for relief. The debtor presented no evidence of how much she earned in real estate commissions from December 1983 (when she received her license) through the date of the entry of the order for relief. The first operating report (for April 1984), however, reflects no such income. Of the $18,154.18 in receipts shown on her 1984 operating reports, (again, reflecting her income situation after the entry of the order for relief) the single largest source of income was some $9,900.00 variously designated as "contributions" from the children or as having been "borrowed" from the children. (Both the debtor and her husband testified that

the debtor's husband throughout the children's lives had established and contributed to investments for the children.) The primary remaining sources of income indicated on the operating reports were a $2,500.00 loan from the debtor's mother and $1,250.00 received from her father-in-law.

Although the debtor's husband is presently serving a prison sentence for various offenses connected with the failure of his banking enterprises, he testified that after the purchase of the house he "was down there for quite a bit after that and lived there in and out." Deposition of Jake F. Butcher, at 19 (January 23, 1986). Furthermore, while the debtor's husband testified that after the bank failed he was primarily occupied in Knoxville "running around like a dog with his tail cut off trying to defend myself and trying to work on bankruptcy complications," *Id.* at 13, he also replied, when asked if or when he moved to Florida, "In spirit or physically? Sometime later on after she did." *Id.* at 29.

■ Upon careful consideration of Florida law, this court is compelled to conclude that the debtor could not be characterized as "the head of a family" on either the date of the filing of the involuntary petition or the date of entry of the order for relief.

The question of what constitutes "the head of a family" has been extensively explored under Florida law. The test which has evolved requires a showing of either a legal duty to support arising out of a family relationship or continuing communal living by two individuals under such circumstances that one is regarded as in charge. *Holden v. Estate of Gardner,* 420 So.2d 1082, 1083 (Fla.1982). The determination of family headship has always involved a factual inquiry. *Cory v. Parks,* 386 So.2d 292, 293 (Fla.Dist.Ct.App.1980). Most significantly, for homestead purposes there can be only one head of a family. *Solomon v. Davis,* 100 So.2d 177 (Fla. 1958).

Prior to 1971 (when the Florida legislature amended the Florida statutes to place a duty of support on both spouses) the principle that there can be only one head of a family was coupled with a presumption that the husband was the head of a family. However, the presumption in favor of the husband's headship was apparently abrogated by the 1971 amendment placing a duty of support on both spouses. *Holden v. Estate of Gardner,* 420 So.2d 1082, 1085 (Fla.1982); *Cory v. Parks,* 386 So.2d 292, 293 (Fla.Dist.Ct.App.1980). Thus, in the proceeding at bar this court has relied only upon the facts presented and not upon any such presumption.

The debtor has cited several cases holding a wife or former wife to be the head of a family for homestead purposes. However, these cases are clearly distinguishable on their facts. *E.g. Stephens v. Campbell,* 70 So.2d 579 (Fla.1954) (where husband whose income was insufficient to provide necessities of life had been dependent on wife for several years, wife was head of a family); *Bigelow v. Dunphe,* 143 Fla. 603, 197 So. 328 (1940) (wife was head of family where husband was mentally and physically incapacitated by severe illness and wife provided for family from orange grove inherited from former husband); *Vandiver v. Vincent,* 139 So.2d 704 (Fla. Dist.Ct.App.1962) (where husband and wife had divorced and husband had remarried and relocated out of state, former wife was head of family in Florida even though her only income was child support from former husband and room rental income). *See also Gilman v. Barnett Bank of South Florida,* 31 B.R. 930 (Bankr.S.D.Fla.1983) (debtor wife was head of family where she generated bulk of family support as self-employed marketing consultant, had two dependent and minor children by a former marriage, and was married to Argentinian who spent most of year in his home country and who could remove only no more than $200.00 annually from his country); *In re Lamerand,* 17 B.R. 255 (Bankr.M.D. Fla.1982) (debtor wife with two minor children from previous marriage was head of family, though married to able-bodied, unskilled laborer who worked as tire changer,

where she furnished the bulk if not all of support for family and handled all household finances).

Here, for the duration of twenty years of marriage the debtor's husband was indisputably the head of the family within the meaning of Florida law. After extreme financial difficulties, part of the family relocated in Florida while the head of the family attempted to untangle his financial and legal difficulties in Tennessee. The debtor and her husband did not divorce. He did not desert her. They remain married. He furnished funds for her to purchase the home in question. He furnished funds for living expenses. At the time of the entry of the order for relief in March 1984 the debtor, who had not earned an income for the past twenty years, had held her real estate license for only about three months. For the remainder of the year even after March the proof showed that her primary source of income was from investments which the debtor's husband had established in the children's names. The debtor's husband, according to his testimony, went to Florida "quite a bit" and "lived there in and out." The extent of the debtor's husband's continued support and continued involvement with the family during the relevant time period simply do not permit a conclusion that he had ceased by either September 1983 or even by March 1984 to occupy the position as head of the family which had been his for the past twenty years.

Consequently, the debtor is not entitled to assert in her bankruptcy case a homestead exemption under Florida law.

## THE TRUSTEE'S OBJECTION TO THE DEBTOR'S CLAIM OF EXEMPTION IN CASH SURRENDER VALUE OF LIFE INSURANCE POLICIES

The debtor has listed in her schedules a number of life insurance policies which she owns and which insure her husband's life. She estimates the cash surrender value of the policies as approximately $96,000.00. In addition, in December 1985 the debtor filed an amended Schedule B-4 claiming an exemption in the cash surrender value of a Massachusetts Mutual policy which she also owns and which also insures the life of her husband. The approximate cash value of that policy is $174,000.00.

As the basis of her asserted exemption, the debtor relies upon the following Florida statute:

The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.

Fla.Stat. § 222.14 (West Supp. 1986).

The trustee objects, contending that the plain language of the statute only exempts the cash surrender value of a life insurance policy from the reach of creditors of the *insured*. Here, the debtor is not the insured, but rather the owner and beneficiary of the policies.

The debtor says the statute was meant to shield the interest of *all* owners of life insurance policies, not merely owner-insureds. She reasons that there is no need to provide statutory protection from creditors of an insured who does not own the policy since only an owner has any right to the cash surrender value of a policy. Thus, she says that the point of the statute is to preserve cash surrender value from the reach of creditors of all owners of policies. The debtor argues for a broad construction extending the statute beyond its plain reading.

However, this court can readily perceive a reason for the legislature to limit the exemption so as to protect cash surrender value only from the creditors of owner-insured and not also from creditors of owner-beneficiaries. This statute and its compan-

ion statute, § 222.13,[3] prevent creditors of the insured from reaching proceeds intended for the beneficiary. These statutes were obviously not intended to protect such proceeds from the claims of the *beneficiary's* own creditors. This court does not believe that § 222.13 was intended to prevent a creditor of a *beneficiary* from reaching benefits paid to the beneficiary upon the insured's death[4] nor similarly that § 222.14 was intended to prevent a creditor of the *beneficiary* from reaching the cash surrender value of the policy where the beneficiary, by virtue of ownership of the policy, has a right to those proceeds prior to the insured's death.

The debtor is not entitled to exempt the cash surrender value of the life insurance policies in question under § 222.14.

3. This section provides:

(1) Whenever any person residing in the state shall die leaving insurance on his life, the said insurance shall inure exclusively to the benefit of the person for whose use and benefit such insurance is designated in the policy, and the proceeds thereof shall be exempt from the claims of creditors of the insured unless the insurance policy or a valid assignment thereof provides otherwise. Notwithstanding the foregoing, whenever the insurance, by designation or otherwise, is payable to the insured or his estate or to his executors, administrators, or assigns, the insurance proceeds shall become a part of the insured's estate for all purposes and shall be administered by the personal representative of the estate of the insured in accordance with the probate laws of the state in like manner as other assets of the insured's estate.

(2) Payments as herein directed shall, in every such case, discharge the insurer from any further liability under the policy, and the insurer shall in no event be responsible for, or be required to see to, the application of such payments.

Fla.Stat. § 222.13 (West 1977).

4. In this connection the court notes the existence of the following Florida statute:

Any life insurer shall have the power to hold under agreement the proceeds of any policy issued by it, upon such terms and restrictions as to revocation by the policyholder and control by beneficiaries and with such exemptions from the claims of creditors of beneficiaries other than the policyholder as set forth in the policy or as agreed to in writing by the insurer and the policyholder. Upon maturity of a policy, in the event the policyholder has made no such agreement, the insurer shall have the power to hold the proceeds of the policy under an agreement with the beneficiaries. The insurer shall not be required to segregate the funds so held but may hold them as part of its general assets.

Fla.Stat. § 627.473 (West 1984).